IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

ALBU TRADING, INC.                      )

                    Plaintiff,        )        C.A. No.

FOOD SAFETY AND INSPECTION SERVICE )
                  Defendant        )        0 5 - 2 5 3

RONALD K. LONGHANY,
( US Cold storage, Milford, DE Plant manager    )
                  Defendant        )

DE STATE BAR ASSOCIATION,
      "in the alternative"
                Defendant        )

The Plaintiff's address:

 Albu Trading, Inc., 2960 Grand Concourse L2, Bronx, New York 10458

Phone  (646) 260 5553

Peteralbu@aol.com



2005 APR 29 PM 1: 24
FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

    The Plaintiff Albu Trading, Inc., represented by its President Peter Albu, complain of the Defendants and alleges upon information and belief, as follows:

    A. Against the Defendant FSIS

    1. On May 14, 1998 the Plaintiff purchased three containers of chicken backs, from Allen Family Foods, to ship to Romania, on the market of this country.

2

2.  While in Romania, the chicken backs were found contaminated with Salmonella, and in conformity with the policy of import of this country the products were prohibited for consumption and, consequently, destroyed.

3. Allen Family Foods, Inc. was sued for money damages, first at the Supreme Court Bronx, New York that dismissed the case for forum non-convenience.

4. On May 12, 2000 Allen Family Foods was sued in the Superior Court of the State of Delaware in and for New Castle County (case no C.A. No. 00C-05-131).

5. After the lawsuit was commenced in the Superior Court, Allen Family Foods filed a motion for summary judgment, founded on the allegation that "concurrent with delivery," the frozen chickens were tested for Salmonella by the Food Safety and Inspection Service (FSIS), that found out that the products were free of Salmonella, and, accordingly, fit to be exported to Romania).

6. On August 30, 2001 the Superior Court granted the motion for summary judgment and dismissed the civil action filed by the Plaintiff. In appeal, on April 29, 2003, the Supreme Court of the State of Delaware, in its final decision, affirmed the decision made by the Superior Court (See attached, as Exhibit A, the Court's Orders.)

7. The State Courts established that Allen Family Foods relied upon three documents, each entitled "Veterinary Certificate for Poultry Meat Exported to Romania", issued by the FSIS, and that all three certificates, dated May 18, 1998, "declare after testing that "meat…shows no evidence of infection with salmonella…on the surface of the carcasses and in the thickness of the muscle or organ tissues…"( The Veterinary certificates are attached as Exhibit B).

3

8. The State Courts established that, in addition to the USDA certificates, Allen Family produced an affidavit, sworn by Ronald K. Longhany, plant manager for US Cold Storage, Inc. (where from the frozen chicken were delivered for export, on May 14, 1998).

9. The plant manager  Ronald K. Longhany  attested that, on the day of delivery, a USDA inspector inspected the chicken, with negative results.

10. While the motion for summary judgment was pendent at the Superior Court, the FSIS, under the Freedom of Information Act Request, confirmed, in its letter #01-214-/March 21, 2001 , that Salmonella testing  took place  on the products on May 18, 1998 ( Exhibit C).

11. The letter issued by the FSIS enhanced the validity of the Veterinary certificates made on May 18, 1998, when the FSIS filed the veterinary certificates and attested that the chicken products were fit for export, free of Salmonella.

12.On December 27, 2001, while the case was in appeal, the FSIS corrected the initial letter, stating that, in fact, there was no Salmonella testing conducted on the products on May 18, 1998, as initially affirmed ( The letter is attached as Exhibit D).

13. The letter was presented to the Supreme Court, which determined that, in the interest of justice, the matter should be remanded to the Superior Court, for consideration.

14. Upon remand from the Supreme Court, the Superior Court, in its decision made on April 04, 2002, denied the motion filed by the Plaintiff, to alter and amend judgment that was founded on the new issued document.

15. In denying the motion, the Superior Court established that the Plaintiff failed to prove that he exercised reasonable diligence, in discovering the information prior to the Court's decision on Allen Family Foods' motion for summary judgment.

4

16. The Superior Court's decision was affirmed by the Supreme Court, on November 22, 2002

17. The Plaintiff alleges that he did not have the new information available, unless the FSIS, on its own, changed the statement that was included in its self-authenticating official document, issued previously.

18. The misstatement made by the FSIS was negligence, and a breach of duty - that had a damaging effect for the Plaintiff, because, based on the wrong information provided by the FSIS, the Plaintiff lawsuit was dismissed, at a stage of a summary judgment motion.

WHEREFORE, the Plaintiff demands judgment against this Defendant in the sum of $76,000, the damage representing the price for the products, expenses related to shipping, loss of business, judicial expenses in the State Courts trials, interest and cost.

B) Against the Defendant Ronald K. Longhany

19. In the light of above paragraphs, this Defendant is joined as Defendant in the same lawsuits, as a concurrent tortfeasors, who contributed to the Plaintiff's damage.

20. The Defendant signed a sworn affidavit, in support of the motion of summary judgment, showing that it has been employed by US Cold Storage as plant manager of its freezer facility in Milford, DE where from, on May 14, 1998 the chicken products were delivered (Attached affidavit, as Exhibit E)..

21. In the same affidavit, the Defendant admitted that his duty includes overall supervision of the freezer facility and maintaining all records applicable to such operations.

5

22. The Defendant admitted that US Cold Storage maintains its Milford freezer facility in compliance with standards contained in the Hazard Analysis and Critical Control Point Plan, "HACCP" plan.

23. In exercising his duties, as plant manager, the Defendant necessarily knew that:

a. As long as the plant was under the implementation of "HACCP plan", testing for Salmonella was mandatory.

"With the publication of its HACCP/ Pathogen Reduction final rule, FSIS adopted pathogen reduction performance standards for raw meat and poultry products using Salmonella as the target organism. To verify that this requirement is being met, FSIS will conduct Salmonella testing in establishments that product raw meat and poultry products" (See attached FSIS "issue papers", Exhibit F)

The "HACCP plan" was implemented in Delaware State poultry system on January 26, 1998.

b. In compliance with the FSIS Directive "Export Certification" (attached as Exhibit G ), certification of the product by the FSIS inspector must indicate that the inspector "has determined that all applicable foreign country requirements have been met".

Certificates should be issued at the time the products leave the official establishment.

c. In compliance with the Poultry Products Inspection Act (attached in extras as Exhibit H), it is a prohibited act to sell, offer for sale or transportation any poultry products required to be inspected, unless they have been so inspected and passed.

In his affidavit, as the State Courts established in their decisions, the Defendant testified that "a USDA inspector inspected the chicken on May 14, 1998, with negative results".

6

24. In the consideration of the new information provided by the FSIS (in its corrected letter, that no Salmonella testing was conducted on the products), the Defendant's affidavit appears to misrepresent the State Courts, that, in fact, in compliance with the Federal regulations, a Salmonella inspection took place at the time of delivery, which, in fact, did not take place.

25. Based on the Defendant's inaccurate testimony in its affidavit, the summary judgment motion filed by Allen family Foods was granted.

WHEREFORE, the Plaintiff demands judgment against the Defendant in the sum of $76,000 (from this amount, his liability is reported to the percentage of his own culpability).

C) Against the Defendant DE State Bar Association

26. The Plaintiff joins this Defendant "in alternative". The factual situation is the same as described in the above paragraphs.

27. The liability of the DE State Bar Association is claimed on behalf of the deceased attorney Mr. David Lank.

28. Mr. David Lank represented the Plaintiff in the case that was consumed at the State Courts. He was apprehended in the case taking in consideration that he was accredited as a full member of DE State Bar Association, to provide careful judiciary assistance to the Plaintiff.

29. If Mr. David Lank failed to use due diligence and care in pursuing the Plaintiff's civil case, the DE State Bar Association bears the collective responsibility to recover the Plaintiff in its loss.

WHEREFORE, the Plaintiff demands judgment against DE State Bar Association for the sum of $76,000.

Albu Trading, Inc./ President

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

*Exhibit A*

|  |  |  |
|---|---|---|
| ALBU TRADING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 00C-05-131-JRS |
| | ) | |
| ALLEN FAMILY FOODS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Date Submitted: August 17, 2001
Date Decided: August 30, 2001

*Upon Consideration of*
*Defendant's Motion for Summary Judgment.*
**GRANTED**.

## O R D E R

This 30th day of August, 2001, upon consideration of Defendant's

Supplemental Motion for Summary Judgment and the Response thereto, it appears

to the Court that:

1.　　This is the Court's second pass at Defendant's Motion for Summary

Judgment. The Court heard oral argument on the initial motion on January 5, 2001.

That Motion was denied pursuant to Superior Court Civil Rule 56(f). The Court

granted the parties additional time for discovery with the understanding that

Defendant could again file its motion when the additional discovery was completed. Additional discovery has been taken[1] and Defendant has now renewed its motion.

2.      Plaintiff, Albu Trading, Inc. ("Albu"), purchased a quantity of frozen chicken backs from Defendant, Allen Family Foods, Inc. ("Allen"). After delivery, Albu exported the chicken to Romania where, upon arrival, the chicken  tested positive for salmonella.  The chicken was pronounced unfit for import under Romanian law and eventually was destroyed.  Albu commenced this litigation to recover the purchase price of the chicken on the theory that the chicken was contaminated when delivered by Allen.

3.      When considering a motion for summary judgment, the moving party bears the initial burden of illustrating the absence of a material factual dispute.[2] If a motion for summary judgment is properly supported by affidavits or other record evidence, the burden shifts to the non-moving party to demonstrate that there are material issues of fact which remain in dispute.[3] The Court must view the record in

---

[1]The discovery deadline passed on April 6, 2001.

[2]*Moore v. Sizemore*, Del. Supr., 405 A.2d 679, 680 (1979)(citing *Ebersole v. Lowengrub*, Del. Supr., 180 A.2d 467 (1962)).

[3]*Brzoska v. Olson*, Del. Supr., 668 A.2d 1355, 1364 (1995).

2

the light most favorable to the non-moving party.[4]  "[T] he moving party is entitled to summary judgment, as a matter of law, if the nonmoving party [after an adequate time period for discovery has passed] fails to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof."[5]

4.    In support of its Motion, Allen has presented evidence which it contends establishes that the chicken was delivered to Albu on May 14, 1998, free of salmonella contamination and frozen at a temperature which would prevent future salmonella growth.  To support its contention that the chicken backs were free of salmonella contamination when delivered to Albu, Allen relies primarily upon three documents, each entitled "Veterinary Certificate for Poultry Meat Exported to Romania," issued by a veterinarian from the united States Department of Agriculture ("USDA").  All three certificates, dated May 18, 1998, declare after testing that: "meat . . . shows no evidence of infection with salmonella . . . on the surface of the

---

[4]*United Vanguard Fund, Inc. v. Takecare, Inc.*, Del. Supr., 693 A.2d 1076, 1079 (1997); *Brzoska*, 668 A.2d at 1364.

[5]*Burkhart v. Davies*, Del. Supr., 602 A.2d 56, 60 (1991)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).

carcasses and in the thickness of the muscle or organ tissues . . . ."[6]  The USDA

requires that chicken exported into Romania satisfy the USDA veterinarian's

examination, and the certificates signify that the chicken is fit for export and that no

further testing is required.[7]

     5.   In addition to the USDA certificates, Allen has produced two affidavits

supporting its Motion for Summary Judgment.  The first affidavit, sworn by Patricia

C. Sigler, Allen's Corporate Director of Quality Control, avers that salmonella

microorganisms are incapable of growth and reproduction at temperatures below 44

degrees Fahrenheit ("°F").  The second affidavit, sworn by Ronald K. Longhany,

Plant Manager for United States Cold Storage, Inc. ("US Storage"), avers that Allen

delivered the chicken to US Storage between February 4 and 13, 1998, and that it was

frozen upon delivery and maintained at 0°F thereafter.  Further, the Longhany

affidavit confirms that on May 14, 1998 (the day Albu assumed possession of the

---

[6]The certificates actually contain two different dates.  One date, found at the top of the document, indicates the inspection occurred on May 14, 1998.  The second date, May 18th, is adjacent to the veterinarian's signature.  This date, apparently, is intended to document that the certificate was "made on" that date even though the actual inspection occurred four days earlier.

[7]The parties acknowledge that only two certifications are required to export poultry to Romania.  The first certificate, "Meat and Poultry Certificate of Wholesomeness," was issued on May 14.  The second required certificate is the "Veterinary Certificate for Poultry Meat Exported to Romania."  These certificates were issued on May 18.

chicken), a USDA inspector visually inspected the poultry and signed the USDA certificates.

6.     Allen has satisfied its burden under Rule 56 by establishing the absence of a material factual controversy.  It has demonstrated that Allen delivered the chicken to US Storage in a frozen condition, that the chicken showed no signs of salmonella contamination, that it was fit for export under USDA testing requirements, and that at all times between inspection and delivery it was maintained at a temperature where salmonella is incapable of growth and reproduction.  Under 6 *Del. C.* § 2-509(2)(b), the "risk of loss" passed to Albu on May 14, 1998 when, presumptively, US Storage (as a bailee) acknowledged Albu's right to possession in the chicken.[8]  Accordingly, Albu would be required at trial to convince the trier of fact that the chicken was contaminated with salmonella when it took possession of the chicken backs on May 14.  Because Allen has met its burden under Rule 56 to

---

[8]Since the transaction at issue concerned the sale of goods (*see* 6 *Del. C.* § 2-105(1)), this dispute is governed by the Uniform Commercial Code ("U.C.C.").  6 *Del. C.* §§ 2-509 and 2-510 address when either party to a transaction bears the risk of loss with respect to the goods involved in the transaction.  According to these provisions, if the chicken was contaminated with salmonella after the risk of loss passed to Albu, Allen would bear no responsibility for that contamination.  Although the parties do not address the issue of when (or by what means) possession of the chicken shifted from US Storage (as bailee of the chicken, *see* 6 *Del. C.* § 7-102(1)(a)) to Albu, the Court may, nevertheless, dispose of the issue *sua sponte* as the determination can be made as a matter of law on the evidence of record.  It is clear that on May 14, US Storage acknowledged Albu's right to possession of the chicken, thus shifting the risk of loss to Albu under § 2-509(2)(b).  This has been established in the record by undisputed evidence that Albu took possession of the chicken and shipped it to Romania on that date.

5

show the absence of a material factual controversy by establishing a lack of record evidence of contamination prior to or on May 14, the burden shifts to Albu who must, in order to survive Allen's motion, establish the existence of a material factual controversy.[9]

7.    To meet this burden, Albu offers several products of the discovery in this case. First, it offers a letter issued by a Freedom of Information Act ("FOIA") officer at the USDA. Albu avers that this letter establishes that no salmonella testing took place prior to delivery of the chicken by Allen. The letter, however, fails to substantiate this contention; it suggests only that salmonella testing took place for the first time on May 18, 1998, instead of May 14, as Allen's evidence initially indicated.[10] The letter does present some factual controversy in that the FOIA officer indicates that the testing took place on a different date than indicated on the USDA certificates. This discrepancy, however, does not create a material factual controversy because it neither establishes that the inspection did not take place nor

---

[9]*Brzoska*, 668 A.2d at 1364.

[10]Albu points out that Allen, as support for its initial motion, supplied an affidavit indicating that the chicken was tested and inspected at Allen's plant in Harbeson, Delaware during February, 1998. The FOIA officer's letter contradicts this assertion, specifically stating that no salmonella tests took place at Allen's plant prior to packaging and shipment. Allen does not, however, rely on this affidavit in its Supplemental Motion for Summary Judgment. Additionally, Albu does not explain how the inaccuracy of the initial affidavit from Allen contradicts Allen's assertion that the chicken was free of salmonella contamination upon USDA inspection at US Storage's facility on May 14 (or May 18) as reflected in the USDA certificates.

does it cast doubt on the accuracy of the USDA certificates or the testing results they report. The fact remains that the USDA certificates reveal that the chicken passed the test for contamination at the time (May 14) or after (May 18) the risk of loss passed to Albu.

8.     Next, Albu asserts that "because [salmonella] is a pathogenic micro-organism, [it] is not susceptible to discovery upon sensory examination." Albu apparently would like the Court to question the validity of the USDA's salmonella testing results.  As support for its assertion, Albu presents evidence suggesting that a topical/sensory examination, such as the one preceding the issuance of the USDA certificates, would not reveal microscopic salmonella contamination.   Albu's proffered evidence indicates that a laboratory test is required to establish (or rule out) the presence of salmonella within a chicken carcass.[11]  This evidence fails to create a material factual controversy concerning whether the chicken at issue was contaminated with salmonella upon delivery to Albu.

9.     The only competent evidence presently before the Court indicates that the chicken was frozen at a temperature where salmonella reproduction does not occur and that the chicken was certified as fit for export on the day it was delivered

_____

[11]The Court has considered Mr. Albu's untimely filed Affidavit which sets forth this information.

to Albu.[12]  Lacking from the record is any evidence indicating that the chicken was

contaminated upon delivery.  For example, the record does not indicate that Allen

processed the chicken improperly, that Allen was encountering a salmonella outbreak

at or around the time the chicken backs at issue were delivered to US Storage, that the

temperature at US Storage exceeded 44°F, or expert evidence to support specifically

any of Albu's claims.[13]  In short, no evidence has been presented upon which a

rational trier of fact could conclude that the chicken was contaminated when Albu

took possession of it.  Albu is the plaintiff in this breach of contract action and would

be required at trial to prove the chicken failed to comply with the contract's

---

[12]Compliance with the export certification requirements, while not conclusive, is probative of compliance with warranties of fitness and merchantability. *See, e.g., Goodman v. Wenco Foods, Inc.*, N.C. Supr., 423 S.E.2d 444, 452 (1992)(compliance with government standards is pertinent to issue of whether any U.C.C. warranties were breached). *See also Blueflame Gas Inc. v. Van Hoose*, Colo. Supr., 679 P.2d 579, 591 (1984)(compliance with safety regulations evidence that product not defective); *Rucker v. Norfolk & W. Ry. Co.*, Ill. Supr., 396 N.E.2d 534, 536-37 (1979)(same).

[13]The general information which Albu has supplied in the form of an e-mail from a USDA technology center and a general discussion of the effectiveness of the USDA's poultry testing regimen printed by the USDA in the Federal Register is not sufficient to create a material factual dispute.  Both of these pieces of evidence hint that organoleptic examination of poultry may not reveal all salmonella contamination.  Since Albu has not linked this information with the specific testing done by the USDA inspector on May 14, however, it has failed to raise a material factual controversy with respect to these best results. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469 (1993)(When "[f]aced with a proffer of expert scientific [evidence] . . ." a court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."); *Pfizer Inc. v. Advanced Monobloc Corp.*, Del. Super., C.A. No. 97C-04-037, Quillen, J. (Sept. 2, 1999), Letter Op. at 7-11 (excluding expert opinion testimony under *Daubert* because it was "not grounded in sufficient facts to be reliable and helpful to the trier of fact.").

provisions, express or implied, with respect to fitness of the product and merchantability when delivered.

10.    Since the discovery deadline has long passed and Albu has presented absolutely no evidence supporting a key element of its claim, the resolution of this motion falls squarely within the holdings of *Burkhart* and *Celotex*.  In *Celotex*, the United States Supreme Court stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.[14]

Since Albu has failed to present any evidence showing that the chicken more likely than not was contaminated at delivery, it has failed to demonstrate that a material factual controversy exists concerning an essential element of its case with respect to which it will have the burden of proof at trial.  Consequently, summary judgment is appropriate.[15]

---

[14]*Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552-53 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)). *See also Burkhart*, 602 A.2d at 59 (adopting *Celotex* language).

[15]*Burkhart*, 602 A.2d at 60.

9

11.   Based on the foregoing, Defendant's Motion for Summary Judgment is

**GRANTED**.

**IT IS SO ORDERED**.

_____

Judge Joseph R. Slights, III

Original to Prothonotary

cc:   Mark D. Olson, Esquire
      David S. Lank, Esquire

10

IN THE SU PREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALBU TRADINC , INC., | § |
| | § |
|     Plaintiff Be ow- | § No. 487, 2001 |
|     Appellant, | § |
| | § |
|     v. | § Court Below—Superior Court |
| | § of the State of Delaware, |
| ALLEN FAMILY FOODS, INC., | § in and for New Castle County |
| | § C.A. No. 00C-05-131 |
|     Defendant E elow- | § |
|     Appellee. | § |

Submitted:  February 14, 2002
Decided:   February 20, 2002

### O R D E R

This   $20^{t}$   day of February 2002, the Court has considered the

appellant's motion to remand, the appellee's motion to dismiss, and the

Clerk's Rule to St ow Cause, as well as the parties' respective responses

thereto. The Court has determined, in the interest of justice, that this matter

should be remande 1 to the Superior Court on a limited and expedited basis

to permit the Supe ior Court to consider the appellant's motion to alter or

amend the judgment below.

NOW, THEF EFORE, IT IS ORDERED that the appellee's motion to

dismiss is DENIED without prejudice. This matter is hereby REMANDED

to the Superior Cou t. The appellant is directed to file an appropriate motion

under Rule 60 in the Superior Court within seven days of the date of this

Order. The Superior Court shall rule on the appellant's motion and issue its
report following remand within 45 days of the date of this Order.

BY THE COURT:

_____
                    Justice

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| ALBU TRADING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Supreme Court No.: 487, 2001 |
| v. | ) | |
| | ) | C.A. No. 00C-05-131 JRS |
| ALLEN FAMILY FOODS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Date Submitted: March 21, 2002
Date Decided: April 4, 2002

*Upon Remand From The Supreme Court*
*of The State of Delaware*
*For Consideration of Plaintiff's Motion to Alter or Amend Judgment.*
**DENIED.**

David S. Lank, Esquire, 1122 West Street, Wilmington, Delaware, 19801. Attorney for Plaintiff.

Mark D. Olson, Esquire, 800 Delaware Avenue, 7th Floor, P.O. Box 2305, Wilmington, Delaware, 19899. Attorney for Defendant.

**SLIGHTS, J.**

## I. **INTRODUCTION**

Plaintiff, Albu Trading, Inc. ("Albu"), commenced this litigation to recover the purchase price of frozen chicken backs that it acquired from Defendant, Allen Family Foods, Inc. ("Allen"). Albu alleges that the chicken was contaminated with salmonella when delivered by Allen on May 14, 1998.

On August 30, 2001, this Court granted summary judgment to Allen.[1] Albu filed a Motion to Alter or Amend Judgment on September 14, 2001[2], which this Court denied on September 24, 2001.[3] Albu appealed both decisions to the Supreme Court of Delaware. After a flurry of motion practice, which primarily addressed untimely filings and allegations of newly discovered evidence, the Supreme Court remanded the matter, directing Albu to file an appropriate motion under Superior Court Civil Rule 60(b) so that this Court could consider the new evidence and determine whether the evidence was such that the summary judgment entered in favor of Allen should be vacated.[4]

---

[1](D.I. 29)

[2](D.I. 30)

[3](D.I. 31)

[4]*Albu Trading, Inc. v. Allen Family Foods, Inc.*, Del. Supr., No. 487, 2001, Steele, J. (Feb. 20, 2002)(ORDER).

2

In compliance with the Supreme Court's remand order, Albu has filed a Motion to Alter or Amend Judgment which asks the Court to vacate its summary judgment in favor of Allen on the ground that this Court based its decision on an inaccurate interpretation of the facts. Specifically, Albu contends that the Court improperly relied upon certain certifications of the Food Safety and Inspection Service of the U.S. Department of Agriculture ("FSIS") which purported to attest that the FSIS had tested the chicken backs before they were delivered to Albu and found them to be free of salmonella contamination. In this regard, Albu claims that it received information on December 27, 2001 from representatives of FSIS indicating that "no salmonella testing had in fact been conducted."[5] Based on this new information, Albu argues that "this court's decision is undercut factually by the inaccuracy of the government supplied information upon which that decision was based" and that this "newly discovered evidence" provides a basis for the Court to reopen its judgment.[6] Allen opposes Albu's motion arguing that Albu has failed to satisfy any of the factors traditionally considered by this Court before it will alter or amend a final judgment. Albu has filed

---

[5]Albu's Motion at ¶9 (Feb. 27, 2002).

[6]*Id.* at ¶10.

3

a reply memorandum in support of its motion.[7]  Appended to Albu's reply is a letter

from an attorney with the U.S. Department of Agriculture ("USDA") which indicates

that FSIS has now "determined that there had been no salmonella testing conducted on

the product in question."[8]

To follow is this Court's ruling on Albu's Motion to Alter or Amend Judgment.

This ruling also will serve as this Court's report to the Supreme Court of Delaware

following remand.

## II. FACTS

The facts giving rise to this controversy are recited at some length in the Court's

decision on Allen's Motion for Summary Judgment.[9]  Of particular relevance to the

motion *sub judice* is the Court's prior determination that Allen had established as a

matter of undisputed fact that it "delivered the chicken to US Storage [on May 14,

1998] in a frozen condition, that the chicken showed no signs of salmonella

contamination, that it was fit for export under USDA testing requirements, and that at

---

[7]Albu filed its reply memorandum on March 21, 2002 without leave of Court.  In a letter dated February 21, 2002, the Court ordered Albu to file its motion under Rule 60 on or before February 27, 2002 and ordered Allen to file its response to the motion on or before March 8, 2002. No reply submission was authorized by the Court's order.  Notwithstanding that Albu again has filed an untimely and/or unauthorized pleading, the Court will consider Albu's reply in ruling on its motion.

[8](D.I. 42)

[9]*Albu Trading, Inc. v. Allen Family Foods, Inc.*, C.A. No. 00C-05-131, Slights, J. (Aug. 30, 2001)(ORDER).

all times between inspection and delivery it was maintained at a temperature where salmonella is incapable of growth and reproduction."[10] The Court's findings were based in part on three certificates entitled "Veterinary Certificate for Poultry Meat Exported to Romania" issued by a veterinarian from the USDA. The certificates indicate that the chicken was tested prior to delivery to Albu and that the chicken showed no evidence of salmonella infection.

The certificates bear two different dates. One date, located on the top of document, indicates that the inspection of the chicken occurred on May 14, 1998 (the date of delivery to Albu). The second date, May 18, 1998, is adjacent to the veterinarian's signature at the bottom of the document. The Court concluded from the express terms of the certificates that the inspection occurred on May 14, 1998 and that the certification of the testing results was "made on" May 18, 1998.[11]

The Court also relied upon two unrebutted affidavits submitted by Allen: one, sworn by Patricia C. Sigler, Allen's Corporate Director of Quality Control, indicates that salmonella microorganisms are incapable of growth and reproduction at temperatures below 44 degrees Fahrenheit; the second, sworn by Ronald K. Longhany, Plant Manager for US Cold Storage, indicates that Allen delivered the chicken to them

---

[10]*Id.* at 5.

[11]*Id.*

5

between February 4 and 13, 1998, that it was frozen upon delivery and maintained at 0 degrees Fahrenheit, and that a USDA inspector inspected the chicken on May 14, 1998 with negative results.[12]

In an attempt to establish a material factual controversy with respect to Allen's motion for summary judgment, Albu offered a March 21, 2001 letter it received in response to a Freedom of Information Act ("FOIA") request directed to the USDA. In that letter, the USDA states that salmonella testing occurred for the first time on May 18, 1998, not May 14, 1998, as indicated by the FSIS certificates. The Court easily reconciled the FOIA response and the FSIS certificates and concluded that the FOIA response "does not create a material factual controversy because it neither establishes that the inspection did not take place nor does it cast doubt on the accuracy of the USDA certificates or the testing results they report."[13] Because the undisputed evidence of record established that the chicken backs were not contaminated with salmonella either at the time (May 14, 1998) or after (May 18, 1998) the risk of loss passed to Albu, the Court granted Allen's motion for summary judgment.[14]

---

[12]*Id.* at 3-5.

[13]*Id.* at 6-7.

[14]*Id.*

In its present motion, Albu asserts that a more recent product of its FOIA requests directed to the USDA, a letter dated December 27, 2001, states that the prior FOIA response concerning salmonella testing was erroneous in that no salmonella testing had occurred on May 18, 1998. In its reply, Albu attached yet another FOIA response, this time a March 19, 2002 letter from an attorney with the USDA stating that the chicken backs were never tested for salmonella. Albu contends that this "newly discovered evidence" reveals a material factual dispute with respect to the condition of the chicken backs at the time they were delivered by Allen. Because the Court based its prior decisions on the absence of a material factual dispute, Albu urges the Court to vacate its prior decisions and allow the case to proceed on the merits.

## III. DISCUSSION

### A. Standard of Review

Superior Court Civil Rule 60(b)(2) ("Rule 60(b)(2)") provides in pertinent part:

> On motion and upon such terms as are just, the Court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons: (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).[15]

Interpreting Rule 60 (b)(2), our Supreme Court has outlined five predicates for relief on a motion to alter or amend a final judgment:

_____

[15] Super. Ct. Civ. R. 60(b)(2).

[T]he newly discovered evidence has come to the [proponent's] knowledge since the trial; that it could not, in the exercise of reasonable diligence, have been discovered for use at trial; that it is so material and relevant that it will probably change the result if a new trial is granted; that it is not merely cumulative or impeaching in character; and that it is reasonably possible that the evidence will be produced at trial.[16]

Albu has the burden of establishing that its "newly discovered evidence" satisfies each of the above criteria before the Court will alter, amend, or vacate its prior judgment.[17]

**B. Albu Has Not Established Due Diligence**

In order to qualify as newly discovered evidence, the Court must be satisfied that Albu, with the exercise of reasonable diligence, could not have discovered the information prior to the Court's decision on Allen's motion for summary judgment.[18] In this regard, Albu has stated only that it "believed [the March 21, 2001 letter] to be erroneous and attempted to obtain correct information from FSIS by requesting administrative review of its response."[19] Albu's request for administrative review, however, was not made until August 27, 2001, over five months after receiving the

---

[16]*Levine v. Smith* 591 A.2d 194, 202 (Del. 1991), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del. 2000).

[17]*Id.*

[18]*Id. See also Bachtle v. Bachtle,* 494 A.2d 1253, 1255-56 (Del. 1985)("Newly discovered evidence" is evidence that was "in existence and hidden at the time of judgment.")

[19]Albu's Motion at ¶7 (Feb. 27, 2002).

8

letter it believed to be erroneous, four months after the discovery cut-off, and eleven days after the oral argument on Allen's motion.[20]

Albu has failed even to address, much less adequately explain, how its efforts constitute due diligence. Had Albu made its request for administrative review shortly after its receipt of the March 21, 2001 letter which it believed to be erroneous, it likely would have received the "new" information before the Court issued its opinion granting Allen's motion for summary judgment.[21] More importantly, Albu never once advised the Court (or Allen) that additional time for discovery was required or that pending requests for information had gone unanswered.

---

[20]As the Court has noted in previous decisions, Allen's first motion for summary judgment was denied at Albu's urging because Albu needed more time for discovery. The Court gave Albu ninety (90) days to take additional discovery. Albu never requested an extension of this deadline. It is not clear what, if any, discovery occurred during the prescribed time for discovery. It is clear, however, that Albu's efforts to discover facts in support of its claim began in earnest after the discovery cut-off expired. Indeed, even after Allen's motion was submitted for decision and after the Court issued its decision, Albu continued to *initiate* efforts to secure information which was readily available at the outset of this litigation.

[21]Albu made its request on August 27, 2001 and received a response on December 27, 2001—four months later. Had Albu made its request shortly after receipt of the March 21, 2001 letter, it appears that Albu would have received the new information before the Court's August 30, 2001 ruling on Allen's motion for summary judgment.

The Court's inquiry ends with its finding that Albu did not exercise due diligence.[22] Due diligence must be demanded of the party who moves for relief under Rule 60(b)(2) in all instances; it is not a standard to be applied half-heartedly just because the consequences of strict adherence are severe. As Professor Moore explains:

> Although newly-discovered evidence must be likely to change the outcome of a case in order to justify relief from a judgment, this does not mean that any other requirement of the rule may be abandoned when it *is* shown that the newly-discovered evidence is conclusive and would definitely change the outcome of the case. In particular, the requirement of due diligence in discovering the evidence must still be satisfied in order to obtain relief, even when the newly-discovered evidence might be considered "conclusive". (footnote omitted) Because the language of Rule 60(b)(2) expressly states that it provides relief for newly-discovered evidence only when the moving party has shown "due diligence," (footnote omitted) there would seem to be little room for a court to claim that it could provide relief, even when a moving party fails to meet the criteria of the rule, because there is newly-discovered evidence that is arguably "conclusive." (footnote omitted)[23]

---

[22] Until receipt of the latest letter from the USDA dated March 19, 2002, the Court was not satisfied that Albu's new evidence was "so material and relevant that it will probably change the result."*Bachtle*, 494 A.2d at 1255-56. Albu misstated what the USDA's December 27, 2001 letter actually revealed. In its motion, Albu averred the letter proved "that no salmonella testing had in fact been conducted." But the December letter actually states that "[t]here were no Salmonella test conducted on *May 18, 1978.*"(emphasis supplied) The Court already had concluded that the FSIS certificates reveal that testing occurred on May 14, 1998 (as opposed to May 18, 1998). The December letter was not inconsistent with this conclusion. The March 19, 2002 letter, on the other hand, although ambiguous, does appear to indicate that the chicken was not tested for salmonella at all. This letter, if explained, may have changed the Court's ruling on Allen's motion for summary judgment.

[23] 12 James Wm. Moore *et al.*, Moore's Federal Practice ¶ 60.42(10) (3d ed. 1997).

Delaware's courts do not interpret the rule differently. "[T]he notion that a 'manifest miscarriage of justice' will occur if a party is not permitted to reopen the record to introduce 'practically conclusive evidence' that concededly could have been presented earlier had the moving party been diligent...has not been accepted as the law in Delaware."[24] Albu has failed to show why its "newly discovered evidence" could not have been secured prior to the discovery cut-off or, at least, prior to the Court's decision granting summary judgment to Allen. Consequently, Albu has not established its reasonable diligence.

It is a well-founded requirement that a party must demonstrate its efforts to secure available evidence prior to judgment as a predicate to relief based on evidence discovered after judgment. As the court noted in *Ross*,

> [The movant] is misguided in suggesting that the goal of reaching a just result based on all the facts is the only principle to be considered. To the contrary, the Court must also consider an equally valid principle, namely, that judicial determinations, once made, are usually final and that litigation at some point must conclude. In balancing those potentially conflicting principles, the need for finality of a judgment will sometimes outweigh the need to consider all available facts (particularly when the trial is long over) to reach the just result.[25]

---

[24] *Ross Systems Corp. v. Ross*, 1994 WL 198718 (Del. Ch.) at *2 ("In Delaware, a motion for a new trial will normally be denied where the moving party fails to show that by exercising reasonable diligence it could not have discovered the evidence before trial.")

[25] *Id.*

11

## IV. <u>CONCLUSION</u>

Based on the foregoing, the Court concludes that Albu has failed to establish that it is entitled to relief under Rule 60(b). Accordingly, Albu's Motion to Alter or Amend Judgment must be **DENIED.**

**IT IS SO ORDERED.**

Judge Joseph R. Slights, III

Original to Prothonotary

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALBU TRADING, INC., | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellant, | § No. 487, 2001 |
| | § | |
| v. | § Court Below: Superior Court |
| | § of the State of Delaware in and |
| ALLEN FAMILY FOODS, INC., | § for New Castle County |
| | § C.A. No. 00C-05-131 |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted:  November 13, 2002
Decided:    November 22, 2002

Before VEASEY, Chief Justice, WALSH and STEELE, Justices.

## O R D E R

This  22nd day of November 2002, upon consideration of the briefs of the

parties and oral argument, it appears to the Court that:

(1)    This is an appeal from a Superior Court decision refusing to reopen a

judgment under Superior Court Civil Rule 60(b)(2).  The Superior Court ruled that

the appellant had not been diligent in pursuing discovery in order to secure evidence

later offered as "newly discovered."  The standard of review of denial of a motion

to reopen judgment under Rule 60(b)(2) is abuse of discretion.  *Bachtle v. Bachtle*,

494 A.2d 1253, 1255-56 (Del. 1985).

(2)    Upon consideration of the record, we conclude that the Superior Court did not abuse its discretion in refusing to grant relief to the appellant. Accordingly, we affirm the judgment of the Superior Court as reflected in its decision of April 4, 2002.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be, and the same hereby is,

AFFIRMED.

BY THE COURT:

Justice

2

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALBU TRADING, INC., | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellant, | § | No. 487, 2001 |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware in and |
| ALLEN FAMILY FOODS, INC., | § | for New Castle County |
| | § | C.A. No. 00C-05-131 |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted:  December 27, 2002
Decided:     January 24, 2003

Before VEASEY, Chief Justice, WALSH and STEELE, Justices.

### O R D E R

This 24th day of January 2003, upon consideration of the appellant's motion for reargument and appellee's response thereto, the Court concludes that the motion for reargument should be, and hereby is, GRANTED limited to appellant's initial appeal from the Superior Court's grant of summary judgment. The undisposed of matter shall be deemed to have been submitted on the briefs previously filed, without oral argument.

BY THE COURT:

_____
Justice

SUPREME COURT OF DELAWARE

# 67

CATHY L. HOWARD
*Clerk*

AUDREY F. BACINO
*Assistant Clerk*

DEBORAH L. WEBB
*Chief Deputy Clerk*

LISA A. SEMANS
*Senior Court Clerk*

SUPREME COURT BUILDING
55 THE GREEN
P.O. BOX 476
DOVER, DE 19903

(302) 739-4155

April 8, 2003

Mr. Peter Albu
President of Albu Trading, Inc.
2960 Grand Concourse L2
Bronx, NY  10458

      RE:   *Albu Trading, Inc. v. Allen Family Foods, Inc.,*
           No. 487, 2001

Dear Mr. Albu:

Because of the recent death of Mr. Lank, the Court directs you to obtain substitute counsel to represent the corporation in the above captioned matter. Substitute counsel should enter an appearance in this matter no later than **April 22, 2003**.

               Very truly yours,

               *Cathy L. Howard*

/clh

cc:   Mark D. Olson, Esquire

SUPREME COURT OF THE STATE OF DELAWARE

ALBU TRADING, INC.                      )
                                        )
        Plaintiff Below/Appellant,      )   No. 487, 2001
                                        )
        v.                              )   Court Below:
                                        )   Superior Court of the Sate of
ALLEN FAMILY FOODS, INC                 )   Delaware, New Castle County,
                                        )   C.A. No. 00C-05-131 (JRS)
                                        )
        Defendant Below/Appellee.       )

NOTICE OF APPEARANCE

To:  Clerk of the Supreme Court
     Post Office Box 476
     Dover, DE 19903


     PLEASE enter my appearance on behalf of Albu Trading, Inc.,

in the above-captioned appeal.


Dated April 21, 2003

                          McCULLOUGH & McKENTY, P.A.
                          Daniel L. McKenty (Del. I.D.#2689)
                          McCullough & McKenty, P.A.
                          824 Market Street
                          Fourth Floor
                          P.O. Box 397
                          Wilmington, DE 19899-0397
                          (302) 655-6749
                          Attorney for Plaintiff/Appellant
                          Albu Trading, Inc.

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALBU TRADING, INC., | § |
| | § |
|    Plaintiff Below-<br>   Appellant, | § No. 487, 2001 |
| v. | § Court Below—Superior Court |
| ALLEN FAMILY FOODS, INC., | § of the State of Delaware,<br>§ in and for New Castle County<br>§ C.A. No. 00C-05-131 |
|    Defendant Below-<br>   Appellee. | § |

Submitted: April 21, 2003
Decided: April 29, 2003

Before **VEASEY**, Chief Justice, **WALSH** and **STEELE**, Justices

## O R D E R

This 29th day of April 2003, upon consideration of the briefs of the parties and the record below, limited to appellant's appeal from the Superior Court's August 30, 2001 order granting summary judgment to appellee, it appears to the Court that:

(1)    The plaintiff-appellant, Albu Trading, Inc. ("Albu"), filed an appeal from the Superior Court's August 30, 2001 order granting summary

judgment to defendant-appellee, Allen Family Foods, Inc. ("Allen").[1]  We find no merit to the appeal.  Accordingly, we AFFIRM.[2]

(2)     This matter began as a breach of contract action by Albu against Allen.  Albu purchased a large quantity of frozen chicken from Allen.  After delivery, Albu exported the chicken to Romania where it tested positive for salmonella and was destroyed.  Albu sought to recover the purchase price of the chicken alleging that it was contaminated when delivered by Allen.

(3)     In the instant appeal, Albu claims that the Superior Court erred in granting Allen's motion for summary judgment because: a) there are material facts at issue, preventing the entry of summary judgment; and b) the

---

[1]Albu also appealed from the Superior Court's September 24, 2001 order denying Albu's motion to alter or amend judgment.

[2]Following the filing of its notice of appeal from the Superior Court's August 30 and September 24, 2001 orders, Albu filed a motion to stay the appeal and remand the matter to the Superior Court for consideration of a motion to reopen on the ground of newly-discovered evidence under Superior Court Civil Rule 60(b) (2).  On February 20, 2002, this Court granted Albu's motion and remanded the matter to the Superior Court. Following briefing by the parties, the Superior Court denied Albu's motion to reopen.  On November 22, 2002, following briefing and oral argument, this Court affirmed the Superior Court's judgment. *Albu Trading, Inc. v. Allen Family Foods, Inc.*, Del. Supr., No. 487, 2001, Walsh, J. (Nov. 22, 2002).  On December 9, 2002, Albu moved to reargue this Court's decision on the ground that the Court had not yet addressed the issues raised in Albu's original appeal.  By Order dated January 24, 2003, this Court granted the motion for reargument, limiting its review solely to the Superior Court's grant of summary judgment.

risk of loss was improperly shifted to Albu following delivery of the chicken by Allen.

(4)    This Court reviews the Superior Court's grant of summary judgment de novo to determine whether, viewing the facts in the light most favorable to the non-moving party, the moving party has demonstrated that there are no material facts in dispute and that it is entitled to judgment as a matter of law.[3] On a motion for summary judgment, the moving party bears the initial burden of showing that there are no material facts in dispute.[4] Once that burden is satisfied, through affidavits or otherwise, the burden shifts to the non-moving party to show the existence of disputed material facts.[5] The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it will bear the burden of proof at trial.[6]

---

[3] *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991), cert. denied, 504 U.S. 912 (1992).

[4] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[5] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

[6] *Burkhart v. Davies*, 602 A.2d at 59 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

(5)    Allen, as the moving party, presented a number of documents in support of its motion for summary judgment, including three "veterinary certificates" dated May 18, 1998, issued by the United States Department of Agriculture ("USDA"). Each of the certificates confirmed that the chicken was delivered to Albu on May 14, 1998, free of salmonella contamination and frozen at a temperature that would prevent the future growth of salmonella. Allen also presented two affidavits. The first, from Allen's corporate director of quality control, stated that salmonella is incapable of growth at temperatures below 44 degrees Fahrenheit. The second, from the plant manager of United States Cold Storage, Inc. ("USCS"), stated that Allen delivered the chicken to USCS between February 4 and 13, 1998, that it was frozen upon delivery, that the temperature was maintained at zero degrees thereafter, and that a USDA inspector inspected the chicken and signed the veterinary certificates on May 14, 1998, the day Albu took possession of the chicken.

(6)    On the basis of these documents, the Superior Court correctly found that Allen had satisfied its initial burden of showing that no material facts were in dispute. The Superior Court also correctly observed that, under

-4-

the Uniform Commercial Code, it was Albu's burden to demonstrate at trial that the chicken was contaminated with salmonella at the time it took possession on May 14, 1998.[7]

(7)    In response to the documents presented by Allen, Albu offered a letter from the USDA, which it received pursuant to a Freedom of Information Act request. The letter suggested that the salmonella testing took place for the first time on May 18, and not May 14, 1998. The Superior Court correctly found that, while the letter reflected a discrepancy insofar as the test date was concerned, it failed to create an issue of material fact concerning whether the chicken was contaminated with salmonella at the time Albu took possession of it. In a further attempt to create an issue of material fact, Albu presented an affidavit from the president of the company asserting that the USDA test methodology was faulty because no laboratory testing was done.[8]  Again, the Superior Court correctly found no issue of material fact concerning whether the chicken was contaminated at the time Albu took possession of it.

_____

[7]DEL. CODE ANN. tit. 6, §2-509(2) (b).

[8]The Superior Court considered the affidavit even though it was untimely and there was no evidence that Albu's president had expertise in this area.

-5-

(8)    Concluding that there was no evidence in the record supporting Albu's claim that the chicken was contaminated at the time it took possession and that, therefore, Albu had failed to make a sufficient showing on an essential element of its case with respect to which it would bear the burden of proof at trial, the Superior Court granted Allen's motion for summary judgment. Upon an independent review of the record, we reach the same conclusion and affirm the Superior Court's grant of summary judgment.[9]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED. Pursuant to Supreme Court Rule 18, the time within which a motion for reargument may be filed in this matter is shortened to seven days from the date of this Order.

BY THE COURT:

Justice

---

[9]*Burkhart v. Davies*, 602 A.2d at 60-61.

NAME AND ADDRESS OF CONSIGNEE
ALBU NEW YORK TRADE CONNECTION, SLR
HASDEU 101 STREET
CONSTANZA, ROMANIA

DATE  MAY 14, 1998

CERTIFICATE NO.  MPC-858644

### CERTIFICAT SANITAR VETERINAR PENTRU CARNE DE PASARE DESTINATA EXPORTULUI IN ROMANIA

### VETERINARY CERTIFICATE FOR POULTRY MEAT EXPORTED TO ROMANIA

*Exhibit B*

EXPORTING COUNTRY / Tara exportatoare
THE UNITED STATES OF AMERICA·
Statele Unite Ale Americii

COMPETENT MINISTRY
Ministerul competent

UNITED STATES DEPARTMENT OF AGRICULTURE
Ministerul agriculturii

ADMINISTRATIVE TERRITORIAL UNIT
Unitatea administrativ teritoriala

FOOD SAFETY AND INSPECTION SERVICE

ESTABLISHMENT ISSUED THIS CERTIFICATE
Autoritatea emitenta a certificatului     I.D. 19288

UNITED STATES COLD STORAGE, MILFORD, DELAWARE

### IDENTIFICATION OF THE PRODUCTS/IDENTIFICAREA PRODUCSELOR

| NAME OF THE PRODUCTS Denumirea produsului | NUMBER OF PACKAGES Numarul de cartoane | NET WEIGHT Greutatea neta | KIND OF PACKAGE Felul ambalajului | IDENTIFICATION MARKS Marcaie |
|---|---|---|---|---|
| FROZEN CHICKEN BACKS | 1550 CARTONS | 51258.50 LBS | CORRUGATED CARTONS | NONE |

NAME, NO. AND ADDRESS OF THE ESTABLISHMENT APPROVED
BY THE VETERINARY SERVICE/Numele, numarul si adresa unitatii furnizoare
autorizata de serviciul veterinar

P-935    ALLEN FAMILY FOODS
ROUTE 5
HARBESON, DE 19951

CONDITIONS OF STORING AND TRANSPORTATION
Temperatura de depozitare si transport

STORAGE TEMPERATURE -18 DEGREES OR BELOW
TRANSPORTATION TEMPERATURE 0 DEGREES OR BELOW

COUNTRIES OF TRANSIT
Tari de tranzit

CONSTANZA, ROMANIA

POINT OF CROSSING THE BORDER
Punctul de frontiera in Romania

CONSTANZA, ROMANIA

MEANS OF TRANPORTATION
Modalitatea de Transport

VESSEL: OOCL INSPIRATION V529

NUMBER OF CONTAINER, NAME OF THE VESSEL
Numar Container, Nume vas

GCEU 6645003

### CERTIFICATE OF THE FITNESS OF THE GOODS FOR THE CONSUMPTION / ATESTAREA SALUBRITATII PRODUSULUI PENTRU CONSUM UMAN

Herewith it is certified that:
Prin prezenta se certifica:

Poultry meat is derived from clinically healthy birds which were grown in the exporting country and originate from the premise and state in which the premise is located free from poultry infectious diseases including

Carnea a post obtinuta de la pasari clinic sanatoase crescute in tara exportatoare provenind din unitati al statele libere de bolile infectioase ale pasarilor inclusiv urmatoarele:

Ornithosis, psittacosis, newcastle disease, influenza, paramixovirus infection, infectious laryngotracheitis, infectious encephalomyelitis during the last 6 months

Ornithosis (psitacoza) boala newcastei influenta infectii cu paramixovirusul laringotrahita encefalomielita in ultimele 6 luni

The whole territory of exporting country is free from african swine fever for the last three years and for food and mouth disease for the last 12 months

Intreg teritoriul tarii exportatoare este liber de pesta porcina africana in ultimii trei ani si de febra aftoasa in ultimele 12 luni cel putin

Poultry was delivered to the processing establishments licensed by the veterinary service of the exporting country to deliver products for export and which are under its permanent supervision

Carnea provine din unitati al ele sub supravegheirs sanitar veterinara permanente de stat al autorizate pentru export de serviciile veterinare federale ale SUA

In the exporting country poultry was inspected under the supervision of the veterinarian before the slaughter and carcasses and internal organs were subjected to postmortem veterinary sanitary examination

Pasarile au post supuse inspectiei antemortem lor carcas al organele au post supuse inspectiei sanitare veterinare postmortuom

Veterinary sanitary examination did not show that meat has changes particular for contagious disease and it was recognised as fit for consumption

Ca urmare a examinarii sanitar veterinare au s-au constatat modificari specifice bolilor contagioase si carnea a post recunoscuta apta pentru consum uman

Meat is not artificially pigmented, has no hematoms, mechanical contaminations, odor and smell unusual for meat, it was stored and transported with the proper temperature condition, does not contain means of preserving, shows no evidence of infection with salmonella or other bacterial infections on the surface of the carcasses and in the thickness of the muscle or organ tissues, was not treated by colouring substances, ionizing irradiation, or ultraviolet rays

Carnea au contine coloranti artificiali hematoame au a post contaminata prin manipulare au produsa mirosa particulare a post depozitata si transportata in conditiii optime de temperatura nu contine substante de conservare nu a contaminata cu salmonella sau alte bacterii patogene pe suprafata carcaselor in profunzimea muschiului al ial organele interne nu a post supusa unui tratament cu radiatii ionizante sau raze ultraviolete

Meat does not contain harmful residues exceeding limits accepted by U.S. regulations
Carnea nu contine reziduuri peste limitele acceptate de reglementarile SUA

Meat package has the stamp of the U.S. federal veterinary control with clear indication of the name or number of establishment
Ambalajul individual este marcat cu stampila de control veterinar federal indicind in mod clar numele sau numarul unitatii de provenienta

Packing material is used for the first time and satisfies the necessary sanitary hygienical requirements
Ambalajele sint la prima intrebuintare si satisface reglementarile igienice sanitare

Means of transport for meat transportation are treated and prepared in accordance with the rules approved in the USA
Mijloacele de transport au post spalate al dezinfectate uniform reglementarilor SUA

| STAMP/ Stampila | OFFICIAL VETERINARIAN / Medic Veterinar Oficial /TITLE NAME / Titlu, nume | MADE ON / Emis la |
|---|---|---|
| | ISABELITA A. CORPUS, D.V.M. 75-03 | MAY 18,    19 98 |
| | SIGNATURE / Semnatura | |



United States
Department of
Agriculture

Food Safety
and Inspection
Service

Washington, D.C.
20250

*Exhibit C*

March 21, 2001

Mr. Peter Abul
Albu Trading, Inc.
2960 Grand Concourse L2
Bronx, New York 10458

                                    RE:    FOIA #01-214
                                           *Salmonella* Testing

Dear Mr. Albu:

This is in response to your February 10, 2001, Freedom of Information Act request. You requested various documents pertaining to *Salmonella* testing results for poultry products exported to Romania. The testing was conducted on May 18, 1998.

I will respond to your request by addressing the items listed in your letter.

1.   There was no *salmonella* testing conducted on the product in question for the cold storage facility in Milford, Delaware, between the slaughter/packing date February 1998 and the export date of May 18, 1998.

2.   There were no *salmonella* tests conducted at the time of slaughter/packing of this product at Allen Family Foods, Harbeson, Delaware, during February 1998.

3.   HACCP was implemented at Allen Family Foods on January 26, 1998.

This is the only information we in FSIS has pertaining to the items listed.

Thank you for your patience in this matter. If you need further clarification, please feel free to contact me on (703) 892-6039.

Sincerely,

Linda L. Carey
Freedom of Information Specialist
Freedom of Information
   and Privacy Acts Team
Executive Management Staff



**United States**
**Department of**
**Agriculture**

Food Safety
and Inspection
Service

Washington, D.C.
20250

December 27, 2001

*Exhibit A*

Mr. Peter Abul
Albu Trading, Inc.
2960 Grand Concourse L2
Bronx, New York 10458

RE:   FOIA  #01-214
      Correction of FOIA 01-214

Dear Mr. Abul:

This is in further response to your February 10, 2001, Freedom of Information Act (FOIA)
request.  You requested various documents pertaining to *Salmonella* testing results for poultry
products exported to Romania.

In a letter dated March 21, 2001 to you, Linda Carey, the FOIA Specialist whom responded to
your request indicated that **"*Salmonella* test were conducted on May 18, 1998".** However, the
statement was incorrect.  There were no Salmonella test conducted on May 18, 1998.

If you have any questions, please feel free to contact me on (202) 720-2110.

We apologize for any inconvenience.

Sincerely,

Reginald D. Sheppard
Freedom of Information
  and Privacy Acts Team
Executive Management Staff

*Exhibit E*

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| ALBU TRADING, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 00C-05-131 |
| | : | (JRS) |
| ALLEN FAMILY FOODS, INC. | : | |
| | : | |
| Defendant. | : | |

### AFFIDAVIT

Ronald K. Longhany, being duly sworn, deposes and says that:

1.  I am employed by United States Cold Storage, Inc. ("U.S. Cold Storage") as plant manager of its freezer facility in Milford, Delaware.

2.  As plant manager, my duties include overall supervision of the operations of the freezer facility and maintaining all records applicable to such operations.

3.  U.S. Cold Storage maintains its Milford freezer facility in compliance with standards contained in a Hazard Analysis and Critical Control Point Plan ("HACCP Plan") in accordance with U.S. Department of Agriculture ("USDA") requirements of Cold Storage facilities.

4.  Allen Family Foods, Inc. ("Allen") delivered cartons of chicken backs to U.S. Cold Storage between

February 4 and February 13, 1998 which, in accordance with the HACCP Plan, were frozen to 0° F within 72 hours after receipt and maintained at 0° F at all times while in our possession. These cartons are identified by product code 48113.

5. On May 13, 1998, at Allen's direction, 4,650 cartons bearing product code 48113 were assembled and packed in three refrigerated containers, each holding 1,550 cartons, supplied by Allen's customer, Albu New York Trade Connection Inc. ("Albu").

6. The cartons were visually inspected by a USDA official inspector, who issued USDA official stamps, which were applied under his supervision on May 14, 1998. A USDA inspector issued and a USDA veterinarian signed a "Veterinary Certificate For Poultry Meat Exported To Romania" for each refrigerated container.

7. After exchange of documents the refrigerated containers were transported from the freezer facility by Albu.

8. At the time Albu's refrigerated containers were loaded at the Milford facility the cartons remained frozen

at or below 0° F, during the loading process as shown by the "Load Temp" information on the attached "pick tickets" 82743, 82744, and 82745.

_____
Ronald K. Longhany

SWORN, AND SUBSCRIBED before me, the undersigned, on April _10TH_, 2001.

_____
Notarial Officer
State of Delaware

WAYNE R. DAVIS
NOTARY PUBLIC-DELAWARE
My Commission Expires Nov. 28, 2002

Ship Date: 5/14/98    Pick Ticket: 82743    Print D          5/13/98    Time: 10:37
Carrier: REDLINE                            Appt Time: 13:30:00    Door:
Customer: 1001 ALLEN FAMILY FOODS-HAR    Consignee: ALBU NEW YORK TRADE CONNECTION
                                                     2950 GRAND CONCOURSE #2L
Tool Id: NY    Stop No: 000000                       BRONX, NY
Order No: ALB981008/1740-3

Pgs: 1

| Lot | Product Code/Description | Code Date | Net Unit Weight | Quantity Ordrd | Quantity Shipd | Location | Qty |
|---|---|---|---|---|---|---|---|
| | CONS: ROMANIA/BTENCIL, NONE/NEEDS USDA STAMP/FLOOR LOAD | | | | | | |
| B013 | 048113 BACKS 15/KG | 020998 | 33.070 | 1550 | 362 | | |
| | 001 pallets @ 060 + 050 units | | | | | 03-06-105-2- | |
| | | | | | | 03-06-107-1- | |
| | | | | | | 03-06-107-3- | |
| | | | | | | 03-06-112-2- | |
| | | | | | | 03-06-114-2- | |
| | 001 pallets @ 060 + 045 units | | | | | 03-06-114-3- | |
| B03B | 048113 BACKS 15/KG | 020998 | 33.070 | | 38 | 05-11-014-1- | 38 |
| B143 | 048113 BACKS 15/KG | 021098 | 33.070 | | 330 | | |
| | 001 pallets @ 060 + 050 units | | | | | 02-03-305-1- | |
| | 001 pallets @ 060 + 050 units | | | | | 02-03-353-3- | |
| | 001 pallets @ 060 + 050 units | | | | | 02-03-353-3- | |
| B15B | 048113 BACKS 15/KG | 021098 | 33.070 | | 245 | | |
| | 003 pallets @ 060 + 010 units | | | | | 04-08-041-2- | |
| | | | | | | 04-08-107-1- | |

*** C O N T I N U E D ***



**Food Safety and Inspection Service**
**United States Department of Agriculture**
**Washington, D.C. 20250-3700**

*Exhibit F*

**Issue Papers**

**December 15, 1997**

## Issue Paper: Public Release of *Salmonella* Testing Results

### ISSUE:

The Food Safety and Inspection Service (FSIS) is providing its views on release of Salmonella testing data collected by FSIS in connection with the HACCP/Pathogen Reduction final rule.

### BACKGROUND:

With the publication of its HACCP/Pathogen Reduction final rule, FSIS adopted pathogen reduction performance standards for raw meat and poultry products using *Salmonella* as the target organism. To verify that this requirement is being met, FSIS will conduct *Salmonella* testing in establishments that product raw meat and poultry products.

The goal of the *Salmonella* testing program is to verify that pathogen reduction performance standards are being met by each establishment, with an ultimate goal of reducing the incidence of that organism and other enteric pathogens on raw meat ant poultry products nationwide. The pathogen reduction standard for *Salmonella* requires testing of products not to determine product disposition but as a measure of process effectiveness in limiting contamination with this pathogen. Individual test results are not meaningful under this program because the performance standards have been established to measure performance over time; thus, multiple samples are required to make an appropriate compliance determination.

The *Salmonella* testing program is being accomplishes by FSIS in two phases a phase and a compliance phase. The principal objective of the phase was to

acquire *Salmonella* performance standards test data to enable both FSIS ant establishments to see how they were performing relative to the standard. The pre-implementation phase began on June 1, 1997. The compliance phase begins in January 1998. The effective dates for compliance with the *Salmonella* performance standard are the same as effective dates for HACCP implementation: January 26, 1998, for large plants; January 25, 1999, for small plants; and January 25, 2000, for very small plants. After the effective date(s), Salmonella testing results will trigger regulatory actions when the performance standards set forth in the HACCP/Pathogen Reduction final rule are not met by an establishment.

## AVAILABILITY OF *SALMONELLA* TESTING DATA:

- Pre-implementation *Salmonella* testing data: This refers to *Salmonella* testing data collected between June l, 1997, and an establishment's HACCP implementation date, FSIS does not intend to use the data collect between June 1, 1997, and January 26, 1998, for any purpose because it did not collect as much data as originally intended; there are many incomplete sets of data. FSIS will collect pre-implementation testing data from small and very small plants and will determine appropriate use ant disclosure of this data as data collection proceeds. Requests for data under the Freedom of Information Act will be addressed on a case-by-case basis.

- Compliance phase Salmonella testing data: This refers to *Salmonella* testing data FSIS collects in plants subject to the HACCP requirements. FSIS will send to individual establishments their own testing data upon completion of the full sample set. In addition, plant-specific testing data will be available in accordance with the Freedom of Information Act. The Agency does not consider testing to be complete until there is a full sample set, In all cases, the Agency intents to provide en explanation of the purpose of the testing ant the meaning of the data (in general terms) with any *Salmonella* testing data released. FSIS has no specific plans to post the *Salmonella* testing data on its web site.

- FSIS believes that it should publish annually a report on the *Salmonella* testing program. This report would be made available to the public. The contents and format of the report have not yet been decided.

Pathogen Reduction/HACCP Page | FSIS Home Page | USDA Home Page

UNITED STATES DEPARTMENT OF AGRICULTURE
FOOD SAFETY AND INSPECTION SERVICE
WASHINGTON, D.C.

*Exhibit 6*

# FSIS DIRECTIVE | 9060.4 | 11/20/84

## EXPORT CERTIFICATION

### I.    PURPOSE

This directive provides instructions to FSIS inspection personnel on:

   A.    Preparation of official export certificates, MP Forms 130 and continuation sheet, 414-3, 415-3, 415-4, 415-5, and USDA/FSIS Letterhead Certificate.

   B.    Marking boxes for export shipment.

   C.    Recertification of certified product.

   D.    Security of certificates and stamps.

   E.    Payment for export certification services.

### II.    CANCELLATION

Sections 22.4, 22.5, and 22.7, Meat and Poultry Inspection Manual; MPI Bulletin 82-40.

### III.    (RESERVED)

### IV.    REFERENCES

FSIS Directive 5110.1, Reimbursable Services Reference Guide; Parts 350, 351, 354, 355, and 362, and sections 307.4(c), 312.8, 325.8, 325.13, 381.37(c), 381.104, and 381.193 of the Meat and Poultry Inspection Regulations; Part 156 of the Animal and Plant Health Inspection Regulations; Animal Health Division Memorandum 594.1; FSIS/APHIS Memorandum of Understanding.

### V.    FORMS AND ABBREVIATIONS

The following will appear as abbreviated in this directive:

|       |                                            |
|-------|--------------------------------------------|
| AMS   | Agricultural Marketing Service             |
| APHIS | Animal and Plant Health Inspection Service |
| VS    | Veterinary Services                        |

```
MP Form 11        Services Rendered
MP Form 130       Meat and Poultry Export Certificate of
                  Wholesomeness
MP Form 414-3     Horsemeat Export Certificate
MP Form 415-3     Inedible Product Export Certificate
MP Form 415-4     Animal Casings Export Certificate
MP Form 415-5     Animal Casings
Form Letter       USDA/FSIS Letterhead Certificate
```

## VI.   PREPARATION OF EXPORT CERTIFICATES

Examples of completed export certificates are provided as attachments to this directive.

### A.   General Provisions

1.   Certification of the product by the inspector indicates that the inspector has:

a.   Officially authenticated that the product described was inspected and passed, sound, wholesome, and correctly labeled at the time the certificate was issued.

b.   Determined that all applicable foreign country requirements have been met.

2.   Export certifications for certified exempted products are discussed in the Meat and Poultry Inspection Regulations as follows:

a.   Part 350 - Identification, Certification, and Food Inspection Services.

b.   Part 351 - Certification of Technical Animal Fats for Export.

c.   Part 354 - Voluntary Inspection of Rabbits.

d.   Part 355 - Certified Pet Foods.

e.   Part 362 - Voluntary Poultry Inspection Regulations.

*NOTE:  Services conducted under these Parts are reimbursable (See FSIS Directive 5110.1).

3.   Export certifications may be issued by completion of the appropriate MP form(s), or under certain circumstances, by letter on USDA/FSIS letterhead.

4.   Certification of special characteristics of product is available on a reimbursable basis from the AMS grading services.  These include:

FSIS DIRECTIVE 9060.1

   a.   Types of pack or cut, weight ranges of product, quality, type, etc.

   b.   Supplier-purchaser specifications.

   5.   FSIS inspection personnel may request the Poultry Grading Branch, Poultry Division, AMS, to issue export certificates for poultry products outside of official plants when grading personnel are more conveniently located.

   6.   Inspectors may request plant employees to provide clerical assistance in preparing export certificates.

   7.   Certifications and continuation sheets typed on separate stationery must bear the serial number of the corresponding export certificate.

   8.   Product identity or description entered on the certificate must be limited to the terminology on the approved label.

   a.   Special attention must be given to the standards for kinds, classes, and parts of raw poultry. The use of the term "chickens," by itself, is inadequate to identify broilers, fowl, etc.

   b.   Applicable statements, e.g., "fresh" or "frozen", which comply with the regulations, may be used.

   c.   Additional statements, e.g., "lymph nodes on", "lard, current production", may not be added to the product name on the certificate.

   B.   **Completion of Export Certificates.** Correct completion of export certificates is important as this facilitates entry of the product at the foreign port.

   1.   Personnel who complete export certificates must:

   a.   When using abbreviations in addresses, use only commonly abbreviated words, e.g., Inc., Co., Ave., St.

   b.   Supply all weights with appropriate units according to individual country requirements, e.g., lbs., kg.

   c.   Spell out or abbreviate names of months, e.g., January, Feb.

   d.   Type or print the inspector's name and the region/area/circuit code in or under the signature block.

Page 3

     e.   Prepare a continuation sheet when multiple items in the shipment exceed space available on the face of the certificate. (See Attachment 2.) The continuation sheet shall be prepared in quadruplicate and shall include:

        (1). Date issued.

        (2). Title, e.g., Continuation Sheet for Export Certificate MPA- (275001).

        (3). Product description - name, boxes, weight, as indicated on the face of the certificate.

        (4). The inspector's name followed by the region/area/circuit code number. The name and code number must be the same as that on the face of the certificate.

    2.   The FSIS certifying inspector must:

     a.   Proofread all export documents.

     b.   Initial minor erasures or alterations.

     c.   Void and initial any certificates rendered useless.

     d.   Cancel unused space in product description and remarks blocks by drawing a diagonal line from the upper left corner to the lower right corner.

     e.   Sign the original certificate in the signature block:

        (1). In ink.

        (2). Exactly as typed/printed (see Subparagraph B.1.d. of this section).

     f.   Sign supplemental certifications, e.g., special statements required by a specific country, (on the reverse of the certificate or on separate letterhead stationery) and continuation sheets.

        (1). Ensure that separate sheets bear the corresponding export certificate number.

        (2). Where possible, supplemental certifications should be signed by the same inspector who signs the face of the certificate.

        (3). The FSIS certifying veterinary inspector must sign the professional degree after the signature in addition to fulfilling the instructions of Subparagraph B.2., of this section.

*Orig + 1st + 2nd copy to exporter*
*2nd copy to FSIS files with Request*

FSIS DIRECTIVE 9060.1

C.   USDA/FSIS Letterhead Certification

    1.   Issue for:

        a.   Supplementary certifications.

        b.   Inedible poultry products.

        c.   Inedible animal byproducts.

        d.   Other products when specified in the individual country requirements.

    2.   Format.  See Attachment 7.  Prepare in quadruplicate.  Each certificate must include:

        a.   Date issued.

        b.   A certificate number derived from the date of issue, e.g., May 3, 1983 - 050383.  For supplementary certifications, use the corresponding certificate number.

        c.   Establishment/plant number.

        d.   Name and address of consignor.

        e.   Name and address of consignee.

        f.   Certification statement(s), e.g., I, (name of inspector/veterinarian), certify.... (required statement(s).

        g.   Number of packages.

        h.   Net weight.

        i.   Product description.

        j.   Shipping marks.

        k.   Inspector/veterinarian name typed/printed, followed by the professional degree, if applicable, and the region/area/circuit code.

        l.   Signature of inspector/veterinarian exactly as typed/printed.



**Food Safety and Inspection Service**
**United States Department of Agriculture**
**Washington, D.C. 20250-3700**

*Exhibit H*

**Acts**

# Poultry Products Inspection Act

## TITLE 21 - FOOD AND DRUGS

## CHAPTER 10 - POULTRY AND POULTRY PRODUCTS INSPECTION

Section 1 of Pub. L. 85-172 provided: "That this Act (enacting this chapter and provisions set out as notes under this section) may be cited as the 'Poultry Products Inspection Act'."

### § 451. Congressional statement of findings.

Poultry and poultry products are an important source of the Nation's total supply of food. They are consumed throughout the Nation and the major portion thereof moves in interstate or foreign commerce. It is essential in the public interest that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. Unwholesome, adulterated, or misbranded poultry products impair the effective regulation of poultry products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged poultry products, and result in sundry losses to poultry producers and processors of poultry and poultry products, as well as injury to consumers. It is hereby found that all articles and poultry which are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce, and that regulation by the Secretary of Agriculture and cooperation by the States and other jurisdictions as contemplated by this chapter are appropriate to prevent and eliminate burdens upon such commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers.

### § 452. Congressional declaration of policy.

It is hereby declared to be the policy of the Congress to provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles as hereinafter prescribed to prevent the movement or sale in interstate or foreign commerce of, or the burdening of such commerce by, poultry products which are adulterated or misbranded. It is the intent of Congress that when poultry and poultry products are condemned because of disease, the reason for condemnation in such instances shall be supported by scientific fact, information, or criteria, and such condemnation under this chapter shall be achieved through uniform inspection standards and uniform applications thereof.

### § 453. Definitions.

For purposes of this chapter -

- (a) The term "commerce" means commerce between any State, any territory, or the District of Columbia, and any place outside thereof; or within any territory not organized with a legislative body, or the District of Columbia.

subject to this chapter;

- (2) definitions and standards of identity or composition or articles subject to this chapter and standards of fill of container for such articles not inconsistent with any such standards established under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.), and there shall be consultation between the Secretary and the Secretary of Health and Human Services prior to the issuance of such standards under either Act relating to articles subject to this chapter to avoid inconsistency in such standards and possible impairment of the coordinated effective administration of this chapter and the Federal Food, Drug, and Cosmetic Act. There shall also be consultation between the Secretary and an appropriate advisory committee provided for in section 454 of this title, prior to the issuance of such standards under this chapter, to avoid, insofar as feasible, inconsistency between Federal and State standards.

- **(c) Use of trade names; false or misleading marking or labeling; misleading form or size of container**

No article subject to this chapter shall be sold or offered for sale by any person in commerce, under any name or other marking or labeling which is false or misleading, or in any container of a misleading form or size, but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.

- **(d) Withholding use of false or misleading mark, label, or container size or form; modification; hearing; conclusiveness of determination; appeal**

If the Secretary has reason to believe that any marking or labeling or the size or form of any container in use or proposed for use with respect to any article subject to this chapter is false or misleading in any particular, he may direct that such use be withheld unless the marking, labeling, or container is modified in such manner as he may prescribe so that it will not be false or misleading. If the person using or proposing to use the marketing, labeling, or container does not accept the determination of the Secretary, such person may request a hearing, but the use of the marking, labeling, or container shall, if the Secretary so directs, be withheld pending hearing and final determination by the Secretary. Any such determination by the Secretary shall be conclusive unless, within thirty days after receipt of notice of such final determination, the person adversely affected thereby appeals to the United States Court of Appeals for the circuit in which such person has its principal place of business or to the United States Court of Appeals for the District of Columbia Circuit. The provisions of section 194 of title 7 shall be applicable to appeals taken under this section.

## § 458. Prohibited acts.

- (a) No person shall -
  - (1) slaughter any poultry or process any poultry products which are capable of use as human food at any establishment processing any such articles for commerce, except in compliance with the requirements of this chapter;
  - (2) sell, transport, offer for sale or transportation, or receive for transportation, in commerce,
    - (A) any poultry products which are capable of use as human food and are adulterated or misbranded at the time of such sale, transportation, offer for sale or transportation, or receipt for transportation; or
    - (B) any poultry products required to be inspected under this chapter unless they have been so inspected and passed;
  - (3) do, with respect to any poultry products which are capable of use as human food, **any act**

while they are being transported in commerce or held for sale after such transportation, which is intended to cause or has the effect of causing such products to be adulterated or misbranded;

- o (4) sell, transport, offer for sale or transportation, or receive for transportation, in commerce or from an official establishment, any slaughtered poultry from which the blood, feathers, feet, head, or viscera have not been removed in accordance with regulations promulgated by the Secretary, except as may be authorized by regulations of the Secretary;
- o (5) use to his own advantage, or reveal other than to the authorized representatives of the United States Government or any State or other government in their official capacity, or as ordered by a court in any judicial proceedings, any information acquired under the authority of this chapter concerning any matter which is entitled to protection as a trade secret.

- • (b) No brand manufacturer, printer, or other person shall cast, print, lithograph, or otherwise make any device containing any official mark or simulation thereof, or any label bearing any such mark or simulation, or any form of official certificate or simulation thereof, except as authorized by the Secretary.

- • (c) No person shall -
  - o (1) forge any official device, mark, or certificate;
  - o (2) without authorization from the Secretary use any official device, mark, or certificate, or simulation thereof, or alter, detach, deface, or destroy any official device, mark, or certificate;
  - o (3) contrary to the regulations prescribed by the Secretary, fail to use, or to detach, deface, or destroy any official device, mark, or certificate;
  - o (4) knowingly possess, without promptly notifying the Secretary or his representative, any official device or any counterfeit, simulated, forged, or improperly altered official certificate or any device or label or any carcass of any poultry, or part or product thereof, bearing any counterfeit, simulated, forged, or improperly altered official mark;
  - o (5) knowingly make any false statement in any shipper's certificate or other nonofficial or official certificate provided for in the regulations prescribed by the Secretary; or
  - o (6) knowingly represent that any article has been inspected and passed, or exempted, under this chapter when, in fact, it has respectively, not been so inspected and passed, or exempted.

## § 459. Compliance by all establishments.

No establishment processing poultry or poultry products for commerce otherwise subject to this chapter shall process any poultry or poultry product except in compliance with the requirements of this chapter.

## § 460. Miscellaneous activities subject to regulation.

- • **(a) Prohibition of inspection of articles not intended for use as human food; denaturation or other identification prior to distribution in commerce; inedible articles**

Inspection shall not be provided under this chapter at any establishment for the slaughter of poultry or the processing of any carcasses or parts or products of poultry, which are not intended for use as human food, but such articles shall, prior to their offer for sale or transportation in commerce, unless naturally inedible by humans, be denatured or otherwise identified as prescribed by regulations of the Secretary to deter their use for human food. No person shall buy, sell, transport, or offer for sale or transportation, or receive for transportation, in commerce, or import, any poultry carcasses or parts or products thereof

or circumstances is held invalid, the validity of the remainder of the Act and the remaining amendments and of the application of such provision to other persons and circumstances shall not be affected thereby.

This Act (see Short Title of 1968 Amendment note below) shall become effective upon enactment (Aug. 18, 1968) except as provided in paragraphs (a) through (c):

**(a)** The provisions of subparagraphs (a)(2)(A) and (a)(3) of section 9 of the Poultry Products Inspection Act, as amended by section 9 of this Act (section 458(a)(2)(A) and (a)(3) of this title), shall become effective upon the expiration of sixty days after enactment hereof (Aug. 18, 1968).

**(b)** Section 14 of this Act, amending section 15 of the Poultry Products Inspection Act (section 464 of this title), shall become effective upon the expiration of sixty days after enactment hereof (Aug. 18, 1968).

**(c)** Paragraph 11(d) of the Poultry Products Inspection Act, as added by section 11 of this Act (section 460(d) of this title), shall become effective upon the expiration of sixty days after enactment hereof (Aug. 18, 1968).

**For Further Information Contact:**
FSIS Congressional and Public Affairs Staff
1400 Independence Ave. S.W.
Room 1175-S
Washington, D.C. 20250-3700
Phone: (202) 720-3897
Fax: (202) 720-5704

FSIS Home Page | USDA Home Page

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 APR 29  PM 1: 51

Pro Se: Peter ALBU

$250 gd
CASH

#139062

— mag ntc ISS
— Rule 4 ID
— WAIVER
  Forms
  provided
  per request